Mr. Justice Story
delivered the opinion of the Court,—
This is a writ of error to the Circuit Court of the district of Columbia, sitting at Alexandria.. The plaintiffs in error were original defendants in the cause, and the suit- is now before this Court, upon the judgment of the Court below, upon certain pleas of the defendants, to which there was a demurrer ;. and also, upon the instructions given and refused by the Court, upon the trial of certain issues of fact, joined by the parties.
The action is debt upon an official bond, given by Philip- H. Minor, Cashier of the bank, and by four other persons, as his sureties, with condition, that Minor “ shall well and truly execute the duties of'Cashier” of the bank.; and was originally’ brought against all the parties to the bond. The declaration proceeds for the penalty of the bond, without any notice of the condition, and avers, by way of breach, the non-payment .of the penalty. The sureties,-after oyer of the bond and condition, (which thereby became part of the declaration,) severed themselves from the principal, and pleaded nine several pleas. To the two first of these plea's, demurrers were put in; and the Court below, upon consideration, gave judgment upon the demurrers in favour of the bank; and the correctness of this decision, constitutes the first subject of inquiry. >
Exceptions have been taken, both to the matter and the form of ..these pleas; and if the matter of them, or either of them, might constitute a good bar to the action, it may then be necessary to consider, whether that matter is pleaded with due propriety and certainty, according to the established rules of pleading, so as to escape objection upon general demurrer. Both of them are, in effect, though not in form, special pleas., of rad teil corporation. The first plea, in substance, avers,. that, by the charter granted - by the Act- of Congress, of the 16 th of May 1812, ch. .87', the capital stock of the .bank was' by the-charter fixed and limited, to consist of 500,000 dollars, bona fidp; — that the whole-capital stock was not' bona fide filled up, and subscribed for; but, on the contrary, by a collusion between the commissioners, under whose direction the subscript tions were taken, and the subscribers, a large portion of the capital stock, to wit, 18,000 shares, amounting to’180,000 dollars, were filled up, by false and colourable subscriptions;'the ostensible subscribers, after payment of the first instalments, were fraudulently permitted to withdraw the same; and future payments by them, were dipensed with, while, they were still rated and held out-, as stockholders,-for the purpose of coloura- *63 biy filling up the subscription of the whole capital stock, and electing a Board of Directors; and .that, in this manner, and by these means, and by no other, the bank was put into operation.
This plea is meant to rest upon two grounds, to sustain its-legal propriety. First,, that the subscription of the whole capital stock of 500,000 dollars, was a condition precedent to the putting of the bank into operation as a corporation. Secondly, that the.collusion between the commissioners and the subscribers, for the 18,000-shares, being fraudulent, made their subscriptions a mere nullity.
Various answers have been given at the bar, to the legal sufficiency of tlie matters thus pleaded. In the first pilace, it is ’ said, that the defendants are estopped, by the bond, to deny the legal existence of the corporation. I-n the next place, that the charter does not make the subscription of the whole capital stock, a condition precedent to the establishment of the bank.' In the next place, that the question, whether the bank was regularly, and bond fide, put into operation, is matter not Inquirable into, in • a -suit of this nature, but only upon a quo warr.anto, instituted by the government; and, in the last place, that the whole stock being, in fact, subscribed, the fraudulent intention and acts of the parties, did not make the subscript tion of the 18,000 Shares a nullity.’ Let us, then, consider what is the true construction of the charter itself, upon the points raised at. the argument," supposing it to have-been, (which in terms.it is not,) incorporated into the plea, and therefore judicially before us. The first section of the Act of the 16th of May 1812, chap. 87, provides, “ that.the subscribers to the Mechanics Bank of Alexandria, their successors and assigns, shall be, and hereby are created, and made a body politic, by the name and style of the-Mechanics Bank of Alexandria; and-b.y such name and style, shall be, and are hereby'made able and'capable in law, to have, purchase, &C., lands, 8cc, See., and the same to sell, Sec, to sue and-be sued, See. .Sec.; subject to the rules, regulations, restrictions, limitations, and provisions, hereinafter prescribed and declared.4’
In this section, there is noTitpitation as'to the number of the subscribers necessary to constitute the corporation. The subscribers, whether many or few, are declared to be-incorpo--rated; and, unless there be some restriction or limitation elsewhere in the Act, is is most manifest, that the Court cannot intend that any particular amount of subscriptions is indispensable.
The second section provides, “ that the capital stock of said corporation, may consist of 500,000 dollars, divided into shares of ten dollars each, and shall be paid in the following manner, *64 that is to say: one dollar on each share, at the time of subscribing, one dollar on each share at sixty days,. and one dollar on each share, ninety days after the time of subscribing; the remainder to be called for, as the President and Directors may deem proper; provided they do not call for any payment in less than thirty days, nor for more than one dollar on each share, at any one time.” The argument of the' defendants is, that “may,” in this section, means “must;” and reliance is placed upon a well known rule in the construction of public statutes, where, the word “may,” is often cons'trued as imperative. Without question, such a construction is proper, in all cases where the legislature mean to impose a positive and absolute duty, and not merely to give a discretionary power. But no general rule can be laid down upon this subject, further than that that exposition ought to be adopted in this, as in other cases, which carries into effeGt-the true intent and object of the legislature in the enactment. The ordinary meaning of the language, must be presumed to be intended,’unless it would manifestly defeat the object of the provisions. Now, we cannot say, that there is any leading object in this charter, which will be defeated by construing the word “may” in its common sense, as imparting a power to extend the capital stock to 500,000 dollars, and not an obligation, that it shall be that sum and none other. It is by no means clear, from this section, that the legislature contemplated that there should be a capital of 500,000 dollars, on'which the bank was to commence, or carry on its operations. On the contrary, three instalments oniy are required to be absolutely paid in, and the residue of the capital stock is to be paid in, only when the President and Directors may deem it proper. So that the capital stock, except at the discretion of the Board, may never extend beyond, the amount óf 150,000 dollars, for any practical purposes, either as security to the public, or as the basis of discounts. Now, the plea itself does not attempt to deny that all but 18,000 shares of the stock were,. bona fide, subscribed, for; so that, for aught that appears, the capital stock, on which the bank carried on its operation, may have far exceeded that sum. It has been urged, that public policy requires such an imperative construction of the clause, for the public security. But- it is a sufficient answer to that suggestion,' that no such public policy is avowed,'or can be inferred, from the general terms of the Act. When the legislature intends to restrict the capital stock of a.bank, or tolrequire any portion of stock or stockholders- to be indispensable for its legal existence and operations, it is not uncommon to incorporate such a restriction into the charter. The oiriissian to do; so, is quite as sig- *65 aificant. that the legislature did not. deem such a restriction subservient to any manifest public policy.
The legislature might- well presume, after prescribing the maximum to which the capital stock should extend, that the actual capital-to be employed might safely be left to the dis* cretion of the stockholders, or its agents. The 13th section of the charter contains provisions for the security of the public against over issues by the bank, and if any such, restriction had been intended, as the argument supposes, it would naturally have found a place. It declares, that no stockholder shall be answerable for any losses', deficiencies or failure of the capital stock, for any larger sum than the amount of the stock belonging to him-; excepting, that if the total amount of the debt of the bank shall exceed twice the amount of its capital stock, over and above deposits, then the directors shall, in their private capacities, be liable for the excess; and if the directors shall not have, property to pay the amount of the excess, then every stockholder shall be liable for their deficiencies, in proportion to their-shares in the bank. Whether, therefore, the capital stock be great or small, if there be debts due from the bank, exceeding twice-the amount of the capital stock.; which may fairly be construed to mean the capital stock actually paid in; the stockholders become ultimately liable for the excess; and this liability furnishe,Sj if not an-ample, at leas;, a reasonable security against the public evils, -which the argument supposes might result from nqt requiring the whole capital to be subscribed for. At- all events, we cannot perceive any clear legislative intention to make the subscription of the whole capital stock, a condition precedent to the corporate existence of the bank, and unless it is s.o ■ made by the charter, the (patter of the plea falls, and cannot, sustain .the- defence.
. I?, however, this interpretation of- the charter, could not be- supported, and the subscription ,pf the whole capital stock were a condition precedent, the result, so far as the first plea goes, would not be varied.. The fraud and collusion asserted in that plea,, if admitted-in its fullest manner, does not lead to-the-conclusion which-it seeks to establish. ' If the subscription, were fraudulently-made,'with á view to-.evade tlie provisions of the charter, the law* will hold the parties'b.ouM by their subscriptions, and compellable to co.mply with ail the terms • and responsibilities imposed upon , them, in the same manner, as if they were bbna jide subscribers. It will not make, the subscription itself a nullity, but it will .deprive the subscribers of the power. of availing themselves of the same. _The third section of the Act manifestly contemplates cases of fraudulent sub scrip tio»,- -and provides, ■“ that all the subscriptions and shares obtained in honseqn'enre. thereof, shall -be *66 deemed and held to be for the sole and exclusive usé ánd benefit of the persons subscribing, or in whose behalf the subscriptions respectively shall be declared to be made, at the time of making the same; and all .bargains, contracts, promises, agreements, and engagements, in any wise, contravening this provision, shall be'void; and the person, &c.\ subscribing, - &c. shall have, enjoy, and receive the share or shares respectively, &c., and all the interest and emoluments thence arising, as freely, fully, and ..absolutely, as if they had severally and' respectively paid the consideration therefor,; any- such bargain,' 8cc. to the contrary notwithstanding. ”
This section seems to ' us conclusive upon, the point. It avoids all bargains- contravening the provisions .in respect to subscriptions, and gives to the subscriptions the same effect as if they were bona fide made for the real use and benefit of the subscribers; and independently of this provision, it would be extremely difficult to maintain, upon general principles of law, that a private fraud, between the original subscribers and commissioners, could be permitted .to be set up, to the injury of subsequent purchasers of .the stock," who became bond fide holders, without any participation or .notice of the fraud...
For these reasons, we are of opinión that the matter of- the first plea, even if it had been well .pleaded, would constitute no bar to the action..
The second plea is disposed of by the construction of the. charter aireadyantimated, and is fui'tjier open to fatal Objections, from its deficiency of proper averments,' and want-of legal cértaint.y. It makes no averment of the amount of the capital stock, or of the necessity of the whole being subscribed for, before the bank is to be put «^operation.
It asserts no fraudulent combination or subscription; but in the most general terms, without any certainty as to, facts or circumstances, alleges', that the capital stock w.as not filled, up-by any subscription, opened and conducted in pursuance of the Act,so as to entitle the subscribers to bring the action; and.that the subscribers did unjustly- and unlawfully arrogate to themselves the corporate .name, style, and privileges, without the capital stock having been filled up by subscription,- or the corporation having been constituted and composed of actual subscribers, pursuant to' the directions of the Act,1. In point of substance, as well as form, it is bad, upon the established rules of pleading.
This view of the cáse ..renders, it wholly unnecessary'to consider the point made as to the estoppal, and , the necesssity of a quo warranto; on which, therefore, we give np opinión, '
The third and fourth pleas are intended tó.be pleas of general performance; the third is so, in fact, and pursues the corn *67 «Tition of the bond. The fourth ^argumentative,' and' assumes a particular legal interpretation of the condition, that is to say, that the condition covers only wilful defaults, and breaches of -duty, and is nó security for Competent skill and reasonable-diligence in the discharge of ditty, but only for honesty. To these pleas special replications were filed, assigning special breaches of duty, upon which the ’ parties were at issue, and upon this, and all the other issues in the cause, the jury returned a verdict for the plaintiffs. • No exception has been taken to the sufficiency, of these replications.
The fifth plea states a general performance of duty, in obedience to arid in pursuance of the “ directions, rules, orders, usages and'customs of trade and-business, ordained, established <md practiséd in the said bank-, by the authority of the Said' -President'and Directors.’-’ It is, therefore; argumentative,'arid, sjipr poses that compliance with the fules, orders, usages, See,', established and practised by the President and. Directors, whatever they may be, whether within the scope of their power or not, would "be a good and true discharge - of duty.- To this plea, a general- replication was put in, “ that'the said cause of action, in the declaration mentioned, did accrue, as in’the said declaration and breaches.are -set forth, without.this, that the matters set forth in the said plea, are true,” and this the plaintiffs pray may be inquired of by the country; and the-defendants joined in the issue; upon' which a verdict "was found in favour of the plaintiffs.. An exception has' been taken at the argument to this replication, upon the' ground that it ought .to have assigned a special breach, 'and that the omission is- not cured by the verdict. There is ’no quéstion that' the replication is not drawn with technical accuracy and correctness; and if the plea be a good plea of general performance, it is clear, both' upon principle and authority; that', a special breach ought -to have been assigned in the replication•: and the objection, if insisted upon by way of dem'urrer, for that cause, would have been insuperable. The • reason is, that the law requires every issue to be founded-upon soine certain point, that the parties may come prepared with their evidence, and not be taken by surprise, and-the jury may rio't be misled by the introduction'of various matters. -.A covenant or' condition for general performance^ broken by any single omission of duty, and no inconvenience can arise from stating thepar.ticular breach with suitable certainty. But it does not follow,- that if not so stated, the objection may be taken in any stage of the suit. The rule as to certainty in' pleadings, is framed'for the benefit of the parties,'and may be waived by them, and-iri many .cases, both at common law,’and'by the statute of jeo fates, defect's in this particular are .cured by a verdict. It is true, that in *68 a declaration upon a covenant for general performance of duty, if no breach be assigned, or a breach which is bad, as not being in point of law Within the scope of the covenant, the defect is fatal,’ even' after verdict. Com. Dig. Plead., p. 14. But that is not the’present case. Here the declaration- does assign a good breach, by the non-payment of the penal sum stated in the bond. The defendants disclose the condition of the bond upon oyer, and set up a general performance of it; and the replication^ though inartificially drawn, puts in issue the whole matter of-the defence, and denies the performance of it. Tbe'.verdict has found that the condition was not performed, and consequently,, up'ori the whole record, the npn-payment of-the penal sum is admitted, and the excuse for it is negatived. The ’ replication,, then, does assert a-breach, though in too ge-neral a form.. It ought' to have assigned a special breach; but the general breach includes - it, and the verdict having found the general breach, there is, upon principles, no reason shown against the plaintiff’s right’of recovery.
It is exactly like the case of a declarati >n upon a general covenant.of the- like nature, where a particular breach ought to be assigned; and yet if a general breach be assigned, the. defect is-cured, by a verdict for the plaintiff'. Com. Dig. Plead., 48; The objection, then, to the replication to the fifth plea, ‘ cannot now be sustained.
It" is-not necessary to notice the remaining pleas, upon which issues Were joined, because a verdict has been found in all of them in favour of the plaintiffs, however liable to objection some of them may be, and. particularly the seventh plea oi non damnificatus, as an answer to the declaration. They set up special defences, and the- plaintiffs were not -bound to" do more than traverse them.
The%instructions of-tKe Courtygiven and refused at the trial, constitutes the next subject of inquiry. -■ It is conceded, that if the instructions given on the prayer of the plaintiffs were Correct, ;as to the issues on the third and fourth pleas, the’qualifications annexed to them by the Court iti their applications-to the'other issues, were perfectly proper. ’
The first instruction'is, iii substance, that: if Minor, upon his leaving the. bank, failed to pay over or to.- account to the bank for any portion of’ the moneys' of-.the bank, received by him. as Cashiér; then the jury may, and- ought- to- infer that the moneys so. unaccounted for, were wilfully, wasted by MinorJ or applied, to his own use-; and under such circum--stances, the defendants are liable for - the same. . We can perceive no error .in this instruction; the presumption -of a. wilful waste or misapplication of the "funds of. the bank.% the Cashier, was a natural conclusion,, from his failure to’pay'pver *69 or account for the same. It was not put to the jury as a presumption capable of being rebutted by evidence showing a loss by .negligence or accident. If such a loss actually occurred, it was incumbent on .the Cashier to prove it, and his total omission to. offer any such proof, which, from the nature of the case, must be more within his own power, than that of the' Bank, ought to lead the jury to the presumption of the nonexistence of any. such negligence, or accidental loss.
It has been argued, that this instruction is the more material and injurious to the defendants,•• because it proceeds in the latter part, upon a misconstruction of the true import of the condi-, lion of the bond. The condition,, that Minor shall “ well and truly execute the duties of Cashier” of the bank, is said to be merely, a stipulation for honesty, in the discharge of the duties, and not for skill, capacity, or diligence. Wé are of a different-opinion. “Well and .truly to execute-^the duties of the office,” includes not only honesty, but reasonable skill and' diligence. If the duties are performed negligently and unskilfully— if they are violated, from want of capacity or want of care, they can never be said to be “ well and truly executed.” The operations of a bank, require diligence, with fitness and capacity, as well as honesty, in its Cashier; and the security for the faithful discharge of his duties, would be utterly illusory, if we were to narrow down its import, to a guarantee against personal fraud only.
The remarks already made, dispose of the second and third instructions prayed for by the plaintiffs. These instructions, in substance, declare that-the sureties are liable upon the bond, for any wilful or permissive misapplication of the moneys of the bank, which the Cashier knowingly made, or suffered, without authority, whereby the same moneys have been lost to the bank. There seems no ground, upon-which to rest any reasonable objection to such a .direction, to the. jury.
We may now proceed to the consideration of the three instruc, tions prayed for, in behalf of the defendants. The first is, in substance, that if it were the established usage and .practice of the bank, that the Cashier might, in his discretion, permit customers to overdraw, and to have checks and notes charged up, without present funds in the bank; and for the Cashier-to receive and pass, as. cash,, checks, and drafts upon other banks; and if the. balances appearing against such persons charged in the books of the bank, arose out of the exercise of such discretion by the Cashier, in the course of the ordinary transactions of the bank, and pursuant to the established usage and course of business there-adopted, and generally known to the President and Directors, practised and continued with their knowledge, for a series of years from the commencement of the bank, to the termination *70 ef Minor’s c'ashiership, though the existence of such balances, or the particular circumstances attending them, were not formally communicated to the Board of Directors; the jury may infer the approbation, assent, and acquiescence, of the President and Directors, as to such usage and course of business.
The refusal of this instruction, is matter of no small embarrassment and difficulty to this 'Court, from the terms in which it is couched, and the issues on the sixth, eighth, and ninth- pleas, to which, alone, it can be properly applied. Those issues put to the'jury the question, whether the acts of the Cashier, whatever might be their character or kind, were, or were not, done by the wrong, connivance and permission of the President and Directors of the Bank. The point of the instruction is, that the established usage and practice of the bank for a, long period, known to the President and Directors, does afford a presumption of-the approbation, assent, and acquiescence of the President and Directors, as to such usage and practice;" though the balances resulting therefrom, were not formally com-, municated to the Directors. From the shape of the prayer, it is tindoubtedly meant that such usage .and practice was known to the President and Directors, as a board, and in their official character, and received their approbation as such. In a general view, with-reference to the principles of the law of evidence, we are not prepared to admit, that such a presumption could not ordinarily arise.' The ordinary usage and practice of a bank, in the absence of counter proof, must be supposed to result from the regulations prescribed by the Board, of Directors; to whom, the charter and by-laws, submit the general management of the bank, and the--control and direction-of its officers. It would be not only inconvenient, but perilous, for the customers, or any other persons dealing with the bank, to transact their business with the officers upon any other presumption. The officers of. the bank are held out to the public as having authority to act, according to the general usagéy. practice, and course of their business ; and their acts within\he scope of such, usage, practice, and course of business, would, in general, bind the bank in favour of third persons possessing, no other knowledge. In the .case of the Bank of the United States vs. Dandridge, (12 Wheat. 64,) -the subject was under the consideration of this Court; and circumstances far less cogent than the present to 1‘óund a presumption of the official acts of the board, were yet deemed sufficient to justify their being -laid before the jury, to raise such a presumption. If, therefore, the usage and practice alluded to, in the instruction, were within the legitimate authority of the board, and such as its written vote might justify, there would be no question, in this Court, that it ought to have been given.
*71 The pertinency of such a presumption, to these issues, cannot admit of dispute. But the real difficulty remains to be stated. Assuming that the Court, upon these issues, ought to have given the instruction prayed for, the question is whether upon the whole record, that is such an error as now justifies this Court in a reversal of the judgment. If.the instruction had been given, and thereupon, a verdict upon these issues had been found fpr the defendants, could any judgment have been given upon these issues, in favour of' the defendants; or ought the judgment, non obstanle veredicto, to have been for the plaintiffs ? If it ought, then the error becomes wholly immaterial; since, in no event, could the instruction, in point of law, have benefited the defendants. Upon deliberate consideration, we are of opinion, that the pleas, on which these issues are founded, are substantially bad. They set up a defence for the Cashier, that his omission “ well and truly to perform” the duties of Cashier, was, by the wrong, connivance and • permission of the Board of Directors. The question then comes to this; whether any act or vote of the Board of Directors, in violation of their own duties, and in fraud of the rights and interest of the.stockholders of the. bank, could amount to a justification of the Cashier, who was a pariiceps criminis.
• We are of opinion, that it could not.. However broad and general the powers of the direction may be, for the government and management of the concerns of - the bank, by the general language of the charter and by-laws, those powers are not unlimited, but must receive a rational exposition. It cannot be pretended, that the board could, by a vote, authorize the Cashier to plunder the funds of the bank, or to cheat the stockholders of their interest therein. No vote could authorize, the directors to divide among themselves, the capital'stock, or justify the officers of the bank in an avowed embezzlement of its funds. The cases put are strong, but they demonstrate the, principle only in a more forcible manner Every act of fraud — » every known departure from duty,- by the board, in connivance with the Cashier, for the plain purpose of sacrificing the interest of the stockholders, though less reprehensible in morals, or less pernicious in its effects, than the cases supposed, would-' still be an excess of power, from its illegality — and, as such, void, as an authority to protect the Cashier, in his wrongful compliance. Now, the very form of these pleas, sets up the wrong and connivance of the board as a justification; and such wrong and connivance cannot, for a moment, be admitted as an excuse for the misapplication of the funds of the bank, by the Cashier. <.
The instruction prayed for, proceeds upon the same principles, as the pleas. It supposes, that the usage and practice of *72 the Cashier, under the sanction of the board, would-justify a known-'misapplicatio'n of the funds of the bank.- What is that usage and practice, as put in the-case? -It is a usage to allow customers to overdraw — and to have their checks and notes charged up, without present funds in, the bank; stripped of all technical disguise — the usage and practice, thus attempted to be sanctioned, is a usage and practice to misapply the funds of-the bank; and to connive at the withdrawal of the same, without any security, -in favour of certain privileged persons. Such a usage and practice,'is.surely a manifest departure from the duty, both of the Directors and the Cashier, as cannpt receive any countenance in a court of justice: It could not be supported by any vote of the ' directors,’ however -formal; and, therefore, whenever done by the Cashier, is at his owii peril, and upon the responsibility of himself and- his sureties. It is any thing but “well and-truly executing his duties, as.Cashier. ” This view of the matter, disposes of this embarrassing point, and also of the second instruction prayed for* by',the defendants; 'which substantially turns upon the like considerations.
The third instruction prayed for, in effect, was, that the Court would instruct the jury,- that the defendants áre not chargeable in this action for the conduct of Minor in the duties distinctly appertaining to the office' of-teller, whilst he was Cashier in the bank, although those duties were duly assigned to him; because it constituted a distinct office, and the; accounts and proceedings of the teller, wére at all times, kept distinct, and in separate books, from those of the Cashier. In-our judgment, this instruction was properly refused. By-the fifth article of the second-section of the by-laws of the bank, the duties of the,.Cashier are generally pointed out; and among other things, it is provided, that he shall “do and perform all other duties, that may from time bé required of him- by the President or Board of Directors, relative to the affairs of the institution.” On the appointment of Minor as Cashier, who had previously acted as teller, the directors passed a vote, “that the present officers of the bank, do the whole duties of the'bank.” From the other circumstances of the case, the inference is irresistible,- that the duties of. teller were, under this vote, assigned to the Cashier.' If so,- then the performance of. these duties constituted thenceforth a. part of the duties pf the .Cashier, as- such;- and as-much so’, as.' if they had been originally affixed to the office of Cashier. There is nothing in the,iiature , of the duties -of Teller, .incompatible with those of. Cashier; on the contrary,- as is well known, Cashiers often perform the functions of both. The circúmstánce, that the office of teller, and- distinct úccounts,'. and books, were still kept up, does *73 hot vary the legal result. It was a matter of mere, convenience and regularity, for the- government of the bank, in its own business; and probably had no higher, or other origin, than to preserve the same forms and series of accounts, which the bank had adopted at its first institution. The office of tel-, ler had a nominal, but not a real, existence; and, from the time of the union of the duties in the Cashier, as such, there was a legal extinguishment of the separate official character. If the Cashier had originally had the duties of book-keeper and accountant assigned to him, and, in consequence thereof, had kept distinct account books in the bank, no one would have imagined, because he kept separate account books, as Cashier, for his own convenience, or, according to the.-ordinary usage of banks; that he would not, under his bond, have been responsible for mal-conduct, in keeping the general account books of-the bank, to its loss or injury. The bond of the Cashier must' be' construed to cover all defaults in duty, which are annexed to the office from time to time, by those who are authorized to control the affairs of the bank; and sureties are presumed to enter into the contract, with reference to the rights and. authorities of the President and Directors, under the charter and byrlaws.
The remaining inquiry is, as to the effect of the nolle prosequi, which the plaintiffs entered against Minor, after he had pleaded, and after judgment was given against the sureties, in favour of the plaintiffs, upon'all .the pleadings interposed by the sureties. The pleas, of Minor were, mutatis mutandis, the same as the third, fourth^ fifth, seventh,- and ninth pleas, put in by the' sureties; and the question arises, whether under such circumstances, (no objection to the judgment appearing ,.to have been made by the sureties,) this proceeding is an error, for which that judgment ought to be reversed. It is material to state, that th’e bond' on which the suit is brought, is a joint and -several bond. Under such circumstances, the plaintiff-might have commenced suit against, each of the obligors, severally, or .a joint suit against them all. But in strictness of law, he has no right to commence a suit against any intermediate number. He must sue all or one. The objection, however, is not fatal to the. merits, but is pleadable in abatement only; and if not so pleaded, it is waived by pleading to the merits. .The reason is, that the'obligation is still the..deed of all the obligors who are sued, though not solely their deed; and therefore, there is no variance in point of- law, between the deed declared on, and that proved. It is still the joint deed of the parties sued, although others'have joined in it. This doctrine is laid down, and very clearly illustrated, in Mr. Serjeant Williams’s note to the case of Cabell vs. Vaughan, (1 Saund. R. *74 291. Note 2,) where all the leading authorities are collected. If, therefore, the present suit had been brought against the four sureties only, and they had omitted to take the exception by a plea in abatement, the judgment in this case would have been unimpeachable. Is the legal predicament of the plaintiffs changed, by having sued all .the parties, and subsequently,- entered a nolle prosequi, against one of the obligors ? If not in .general, then, is there any legal difference, where the party in whose, favour the nolle prosequi is entered, is not a surety, but a principal in the bond ? not indeed, so named in the bond, but the suretyship resulting as a necessary inference from the nature, and terms of the condition.
These questions must be decided by authority, if any such exist; if none can be found, then, they must be decided by analogy and principle. It may be proper, in tills view, again to notice the fact, that this suit is on á joint and several bond; (hat the defendants Severed in their pleas from the principal; (hat the trial of the issues, (which undoubtedly ought to have been, by the regular course of practice, deferred until the cause was at issue, as to all the parties, or the steps of the law taken to bring them into default;) does not appear upon the record to have been opposed, and that no motion was.made in arrest of judgment, or for a postponement, until a trial of the issues upon the pleas of the principal might have been had. What would have been the proper proceedings under such circumstances, whether to try all the issues by the same jury, and have damages assessed at the same time against all the defendants ; or whether there might have been several trials, and several assessments of damages; and whether, if such several assessments had been made, and differed in amount, any, and what judgment, ought to have been entered; are points upon which the Court.does not think it necessary to give any opinion.
The nature and effect of a nolle’prosequi, was not well defined, or understood, in early times; and the older authorities involve contradictory conclusions. In some oases.it was considered in the nature of a retraxit, operating as a full release and discharge of the action, and, of course, as a bar to any future suit. In other cases it was held not to amount to a retraxit, but simply to an agreement not to proceed further in-that suit, as to the particular person, or cause.of action, to which it was applied. And this.latter doctrine has been constantly adhered to, in modern times, and- constitutes the received law. In cases of tort against several defendants, though they all join in the same pjea, and are found jointly guilty, yet the plaintiff may, after-verdict, enter a nolle prosequi, as to some of them, and take judgment against the rest. The reason is said to be, that the *75 action is in its nature Joint and severed; and, as the plaintiff might' originally have commenced his suit against one only, and proceeded to judgment and execution against him alone, so he might, after verdict against several, elect to take his damages against either of them. A fortiori, the same doctrine applies where the defendants sever in their pleas. Indeed,- in tort, as we shall hereafter see, it does- not seem to have been denied, that cases might exist, in which, if .the .defendants severed in their pleas, the plaintiff might, after judgment against one, have entered a nolle prosequi as to the .others. The- doubt was, whether he could do so before judgment', which was finally settled in favour of ifcc right, and in such cases, where several damages-were assessed against the different defendants, the difficulty was afterwards- cured, by' entering a.- nolle prosequi as to.all but one defendant. And in the same manner, a misjoinder of Improper parties is sometimes aided, The authorities on this subject,- will be found summed up with great accuracy, in a note of Mr. Serjeant Williams, to the case of Salmons vs. Smith, (1 Saund. R. 207, note 2.) In the same note, the learned editor adds, “if an action is brought upon any contract against several defendants, loho join in their pleas, and a verdict is.found against them, it is apprehended .the plaintiff cannot enter a nolle prosequi against any of them; because the contract being joint, the plaintiff is compellable-to.bring his action against all the parties thereto; and he shall not, by entering a nolle prosequi, prevent the defendants againstwhom the ’recovery has been had, from calling upon the other defendants for a rateable contribution."
' ■ So far as this reason goes, it is inapplicable to the present case; for,- the defendants are entitled not only, to a rateable, but a full, contribution over, for the entire sum, against the party •in whose fayour the nolle prosequi has been entered;’ and cónsequenüy, the nolle prosequi docs not touch their rights. It is observable also, that the language is qualified -by the words “ who join in their pleaswhich-are printed in italics, and may therefore fairly be presumed to have been-inserted by the learned editor, ex industria, with a view to point out an.implied dis- ■ tinction between cases, where there is a severance,-and where there isla joinder in the pleas. If there be any-such distinction, it is favourable to the .-present case; for,, the plaintiffs severed in their pleas; from their principal. The learned editor proceeds to state, that, “ if in such actions the defendants sever in their pleas, as -where one .pleads some plea which, goes to his .personal discharge, such as bankruptcy, nc unques executor, and the like, not to the action of the writ,, the plaintiff may enter a nolle prosequi, as to. him, and pt»ceed'.'against the, others; for, with respect to .the bankruptcy,, the statute of 10th. Ann, chap. 5,. makes the *76 other defendant, who is not a bankrupt, liable for the ivhole debt; and therefore, in that particular instance the case is exactly the same, as where an action is joint and several. So the plea of ne unques executor, does not deny the cause of action; but only, that he is one of the representatives of the. testator. When the defendants sever in their pleas, with this limitation as to the extent of the pleas in action upon contracts,- it is immaterial, what is the form of the action; for, the plaintiff may enter a nolle prosequi against any of them, before verdict, and proceed against the rest. ”
The learned editor is fully borne out, in the general position here stated, by the case of Noke et al. vs, Ingraham, (Wilson R. 89,) to whi.ch he refers. The only question is, whether there is any such qualification upon it, as that the plea should be'one going exclusively in personal discharge, and not to the merits ? That is the point of real difficulty. The case in 1 Wilson R. 89, was upon several promises made by the defendants, as partners. .One of them pleaded a former judgment; and issue being taken upon the replication of nul tell record, judgment was given against him, and a writ'of inquiry of damages awarded, and final judgment. The other defendant pleaded his bankruptcy, and upon this, issue was joined; and afterwards the plaintiff entered a nolle prosequi, as to him. Upon error brought, the principal, objection was, that the nolle prosequi, upon-a joint contract of two, was a discharge of both. Mr..Chief Justice Lee said, “ it is agreed, on all hands, that in' trespass against several, the plaintiff may enter a nolle prosequi, as to one, and that will not discharge the other; and therefore, I cannot.see, why it may not be done in this case; and I do not see, how so proper-an. ádvantage can be taken upon the statute of Ann, as to the bankrupt, as is now taken by the entry, of this nollepfosequi.” Wright, Justice, was of the same opinion, and so was Dennison, Justice; and the latter added, that “the plea of the bankrup't is not a plea to the action, but. only a personal discharge; but that if one defendánt was to plead á -plea' that was to go to-the action of the writ, he thought it might thén.have a, different consideration, but that this' is not the case here. This .cáse is exactly the same, ,as when an action is joint 'and several; for, the statute 10th Ann, ch. 15, has made the partner nota bankrupt, liable for the whole'debt. This case is/the very same, as to this matter of entering a nolle prosequi, as'if it had been trespass against several defendants.” .
It is apparent, from this summary..of the reasoning of the • Court, that the case' turned.-upon t’he consideration, that'the , contract, -by the operation' of the statute of Ann',, was several as well as-joint; and all the Court concurred, that, under such circumstances, the nolle prosequi would be good, being govern *77 ed, in the analogy, to-.trespass, where the cause of action-was several as wcll.as joint. What was stated by Dennison, Justice, was not the exclusive ground of his. particular opinion, but only a suggestion, that the case might be, (not would be,) different upon a piea to the merits. Now, the general reasoning comes very close to the case at bar; for here the bond is several, as well as joint, and an action might have been maintained severally against the defendants; and what is not immaterial to be considered, all the parties were retained, who had joined in their- pleas, and between whom there existed a right of mutual contribution. Even in the case of bankruptcy,, the practice is, in England, to require all the joint contractors to be sued, as is proved by the case of Bevil vs. Wood, (2 Maul & Selw. 23,) which makes it really less strong than a joint and several contract.
• The’ case of Moravia, and another, vs. Hunter & Glass, (2 Maul & Selw. 444,). which has been relied on, at the bar, was assumpsit against four, defendants; two of whom were not served; D., one of the othe,r defendants, pleaded — 1 .'Non assumpsit. 2. A special plea of bankruptcy. 3. A general plea of bankruptcy, -as to whom the plaintiff entered a nolle prosequi. The other, defendant pleaded non assumpsit,- and a verdict was found against him. ■ The form of the nolle prosequi was, that the plaintiffs, inasmuch as they “ cannot deny the several matters abovepleaded, by the said D., freely here in Court confess, . that they will not.further prosecute their suit against him.” -It was moved,-in arrest of judgment, that the nolle prosequi, so entered, had. confessed • the non assumpsit, as well as the other pleas; and therefore, the other defendant was also discharged, and the distinction of Dennison, Jus.-, in Noke vs. Ingraham (1 Wils. R. 89,) was., relied on. But the Court held; that the nolle prosequi -was, in effect, only-a confession; that as far as-regards D., he .had a defence in the matters pleaded by him. This case does not,-in terms, overrule the distinction, but it doés establish, that the Court upheld- the nolle prosequi, notwithstanding the pleadings did set up a. plea to the merits, and not merely a persona! discharge. The contract does not appear to have been joint and several;' and to have arrived at its ¡conclusion, the Court must have considered, that the confession •c.f the plaintiffs, that they could not deny the several matters above pleaded, ought not to be deemed an admission of the truth of the pleas, except so far as to waive further proceedings in the suit, against the party who sets them up as a defence. This conforms to the, definition given in the book, of a nolle prosequi. “It is,” as Serjeant Williams states, (1 Saund. R. 207, note 2,) “ a partial forbearance by the plaintiff to proceed *78 any further, as to some of the defendants, or to part of the suit, but still he is at liberty to go on as,to the r.est.”
. These are. the only cases in England, which the researches of counsel'have-brought to our notice,bearing directly on the point before the Court; and upon,looking into the elementary treatises and books of practice, we have not been able to find any more /general doctrine. Indeed, the latter confine themselves exclusively to the enunciation of the principles above stated, with the qualifications annexed to them in these authorities, as, see 1 Chitty’s Plead., 32, 33. 546. Com. Dig. Pleader, X 2. 3. 5. 2 Tidd’s Practice, 630. 2 Arch. Practice, 219, 220. 2 Lilly’s Practical Register, 280. In America, the cases have gone a step further. In Hartness vs. Thompson, (5 John. R. 160,) where an action was brought.against three, upon a joint and several promissory note, and there was a joint plea ofnont. assumpsit, and the infancy' of the defendants, that was set up at the trial; it was held no ground for a nonsuit; but the plaintiff upon a verdict found in his favour against the other two defendants, might enter a nolle prosequi, as to the infant, and take judgment upon the verdict against the others. In Woodward vs. Marshall,(1 Pickering’s Reports, 500,) in the Supreme' Court of Massachusetts, upon a joint contract and suit against "two persons, one of whom pleaded infancy, . it was held that ¿.nolle prosequi might be entered,-as'to the infant, and the suit prosecuted against. >the othér defendant. These decisions were admitted -to be against the cases of Chandler vs. Parker, (3 Esp. Rep. 76,) and Jaffray vs. Frebain, (5 Esp. Rep. 47,) but the Court thought the practice adopted - by themselves was most convenient, and ■ therefore gave-it a judicial sanction; These cases were distinguishable from that in i Wilson’s R. 89, in the fact, that the'plea went, not only in' personal discharge, but proceeded úpon a matter- which established an original defect in the joint contract; whereas the plea of bankruptcy was for matter arising afterwards." The distinction was not thought to be sound. Indeed,-the-Court-seem to have, considered-the question rather as a'matter'of practice, to be decided upon convenience and. policy, than as matter of principle.
Hitherto the question has been discussed, as’if the nolle prosequi had been entered ¿e/bw;,;when"in fact it was-.entered after judgment' -against the defendants. The next inquiry is; whether this creates any substantial difference in the c’ase.. In Lever vs. Salkeld, (2 Salk. 455,) in trespass against two defendants, and verdict 'for the plaintiff,-one being an infant, the plaintiff took1 judgment against the other, and entered a non pros/sir ter the judgment against the infants, and took- out execution upon the judgment;. upon error brought, it was objected- that *79 a nonpros. ccmld not be entered after judgment, for the judgment could not va.ry from the demand of the writ/' It was argued' on tire other side, that torts were several, and. that a non jiros might be entered after, as well as before judgment, and cases to this effect were cited. Lord Iiolt is reported to. have said, that he supposed there were interlocutory judgments, wherein it might well be; but a final judgment differed, for that being once wrong, a subsequent entry would not set it right. The case was however adjourned, and nothing more appears of it. This case is not very'accurately reported, and it may-have been that the judgment was joint, and the nolle prosequi afterwards, which would remove the objection toils authority. The circumstance of its being adjourned, shows that the doctrine thrown out by Lord Holt, was not deliberately ..considered by him, and was deemed not clear. In truth, it is directly against the case of Parker vs. Lawrence,' decided in the Exchequer chamber, and reported in Hobart’s Itep. TO. That was trespass against three ; one pleaded not guilty, and the other two a justification, to which the plaintiff replied, and there was a demurrer to the 'replication. Pending the demurrer, the issue was tried, and damages and judgment given against him. After judgment, the plaintiff entered a nolle prosequi against the other two, and a writ of error was afterwards brought by all three ; and it was alleged for error, 'that the nolle prosequi .discharged all three. It .was agreed by the Court, (in conformity with the doctrine then prevailing,) that, if the nolle prosequi had been before judgment, it would have discharged the whole action; and. so it would, if the judgment had been against them all,'and then the plaintiff had entered a nolle prosequi against the other two; for amonsuil, or release, or other discharge of one, discharges the rest. But here the action was at am end, as to the one, by the judgment against him, and no judgment was had' against the others, so -that they were divided'from him, and are not subject to'the damages found a'gainst him. It was adjudged that he was not discharged, and there was. no error. This case is of great authority, having been deliberately decided by a very high Court. It is cited as authority,by Chief Baron Comyns, in his digest, (Pleader, X. 5,) who also cites '(Pleader, X. 8',) the case in Salkeld, .as one in which there was a final judgment against all the defendants. The reason of the thing would seem entirely in favour of the judgment in Hobart, and it stands supported.by a much earlier case, in the year Books, (14 Edw. 4; Brooks abridg. Trespass,pl. 331.) If the plaintiff may, in. any case,' recover a judgment against one on a joint action against two, who sever in their pleadings, it is wholly immaterial to the regularity and effect of that judgment, in what stage'of the cause the suit has ceased to be pro *80 secuted .against the other. It is sufficient, that in the event the judgment is consistent with the general principles.of the action. If a nolle prosequi' may be entered, .after verdict, and before judgment, without discharging the other party, there is no good reason why.it may not be done after, judgment, when there has been no proceeding which binds the plaintiff to consummate a judgment , against, the party whom he wishes to dismiss. In each case the. judgment upon the whole record is consistent with the writ.
The result of this examinatión into authorities, is, that there is no decision exactly in point, to the present case; that there is no distinción between entry of a nolle prosequi before, and the entry after judgment,- applicable to: the prcsent'facts. That the authorities, and particularly the American, proceed upon the ground that the question is matter of practice, to be decided upon considerations of - policy and convenience, rather than matter of absolute principle; and that therefore this Court is left at full liberty to .entertain such a decision as its own notions of general convenience, and legal analogies would lead- it to adopt. We .are of .opinion, that where the defendants'sever in their pleadings, a nolle prosequi ought to be allowed. It-is a practice which violates no rules of pleading, and will generally, subserve the public convenience. In the administration of justice, matter of form, not .absolutely'subjected (o authority, may well yield to the substantial-purposes of justice.